# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

RICHARD MELTON,
*Prisoner Identification No. 359324*,

    Plaintiff,

v.

WEXFORD HEALTH SOURCES,
MR. OMBUDSMAN,
KIM CARTER, *Health Service Administrator*
LASAHUN D. TEMESGEN, M.D.,
*Regional Medical Director*,
ZOWIE BARNES, M.D., and
LASHONDA GRIER,
*Health Service Administrator*,

    Defendants.

Civil Action No. TDC-16-2575

## MEMORANDUM OPINION

Plaintiff Richard Melton, currently incarcerated at Jessup Correctional Institution ("JCI") in Jessup, Maryland, has filed suit under 42 U.S.C. § 1983 alleging that Defendants Wexford Health Sources ("Wexford"), JCI's contracted medical services provider; Kim Carter, a Health Service Administrator; Dr. Kasahun D. Temesgen, Wexford's Regional Medical Director; Dr. Zowie Barnes; Lashauna Grier, a Health Services Administrator (collectively, the "Medical Defendants");[1] and "Mr. Ombudsman" were deliberately indifferent to his medical needs stemming from chronic foot pain, in violation of his rights under the Eighth Amendment to the United States Constitution. Presently pending is the Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Having reviewed the submitted materials,

---

[1] The first names of Defendants Temesgen and Grier were misspelled in the Complaint.

the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion, construed as a motion for summary judgment, is GRANTED.

## BACKGROUND

On April 15, 2015, Melton complained of foot pain during a sick-call visit with Physician's Assistant ("P.A.") Romain. Melton informed P.A. Romain that he had had foot pain for the past six years, but that it had worsened in the last month. P.A. Romain noted that Melton's symptoms were consistent with plantar fasciitis, a condition that occurs when the flat band of tissue that connects the heel bone to the toes is strained, leading to pain in the bottom of the foot and heel. P.A. Romain placed an order for arch insoles for Melton. Melton received those insoles about three weeks later.

On May 29, 2015, during a chronic-care visit for a different medical condition, Melton remarked to Defendant Dr. Barnes that his arch insoles did not fit properly. Dr. Barnes stated that she would investigate whether the insoles were the proper size and instructed Melton to check back in two weeks. On June 22, 2015, Melton again saw Dr. Barnes for a scheduled visit and was instructed in stretching exercises for his feet. On June 27, 2015, Melton was provided with a new pair of arch supports.

On August 11, 2015, Melton had the opportunity to see a physician's assistant about his foot condition but declined. In a letter dated August 13, 2015, Melton wrote to Defendant Grier, a Health Services Administrator. Melton asserted that P.A. Romain diagnosed his condition as plantar fasciitis, and that neither the provided arch supports and foot exercises nor several visits to physician's assistants had resulted in relief. As a result, he declined the latest appointment with a physician's assistant because he believed that there was nothing else that they could do for

his condition. He therefore asked Grier to arrange for a referral to a podiatrist. According to Melton, Grier never responded.

On August 19, 2015, Melton was again seen by P.A. Romain for a sick-call visit. Melton complained that despite the insoles and an unspecified pain medication, he was not getting relief of his symptoms. P.A. Romain prescribed Neurontin for his pain and referred him to a prison doctor for evaluation for a possible referral to an orthopedist. On August 24, 2015, Melton sent a second letter to Grier that reiterated the chronology of his condition and related treatment, his continuing foot pain, and his request to see a podiatrist, to which she again allegedly did not respond.

On September 10, 2015, Melton again reported foot pain at a sick-call visit with a nurse practitioner. After a physical examination, Melton was prescribed Indomethacin in addition to his other pain medication. On September 17, 2015, Melton was examined by Dr. Barnes, who again assigned stretching exercises, renewed his pain medication prescriptions, and referred him to Defendant Dr. Temesgen, the Regional Medical Director. On October 9, 2015, during a visit for another condition, Dr. Barnes lowered Melton's Neurontin dose from 300 milligrams to 100 milligrams after determining that it was causing tremors.

On November 18, 2015, Melton arrived late to his appointment with Dr. Temesgen and thus was not seen that day. However, prison medical staff still reviewed his file and ordered an ankle-brachial examination to screen Melton for possible peripheral vascular disease.

On December 22, 2015, during a sick-call visit, Melton complained of foot pain radiating up to his back, coupled with numbness and swelling. Melton was instructed to stay on his previously prescribed pain medications and was given a muscle rub to further alleviate pain. On January 7, 2016, Melton was sent to Bon Secours Hospital for the ordered ankle-brachial testing.

That examination revealed that Melton's circulation was normal. Melton returned to JCI the next day, where he was told to continue his pain medications and was given physical therapy instruction before returning to his cell.

On January 15, 2016, during an appointment with Dr. Barnes, Melton informed her that one of the hospital technicians at Bon Secours had told him he needed an MRI to determine the source of his foot pain. Dr. Barnes informed Melton that she would not be ordering an MRI. She did, however, review with him other imaging of his foot from a bone scan that revealed mild degenerative changes. After a discussion with Melton, Dr. Barnes returned his Neurontin dose to 300 milligrams, with the understanding that the increase might again cause "jittery feelings." Opp'n Mot. Dismiss Ex. 4, ECF No. 15-5. Melton also asked about another special insole that had been ordered and was told that once it arrived it would be provided at his next chronic-care visit.

On February 12, 2016, during another sick-call visit, Melton complained about swelling in his legs and abdomen and numbness in his arm. Melton was ordered compression stockings and advised to continue his current medication regimen. In a letter dated February 14, 2016, Melton complained to Defendant "Mr. Ombudsman" that, although he had been suffering from foot problems since 2009, his symptoms had not yet been relieved, and complained in particular that Dr. Barnes had not ordered an MRI. He also reported that he had been denied special shoes to address his condition. Melton asserts that he never received a response to his letter.

On February 22, 2016, Melton again saw Dr. Barnes and, among other medical issues, complained about his ongoing foot condition and requested a podiatry referral. Dr. Barnes asked Melton to demonstrate the exercises she had previously given him to do, but Melton was unable to do so. Dr. Barnes ordered a referral to Dr. Tefferra for a review of Melton's condition and

assistance with symptom management. On February 26, 2016, Melton received his compression stockings.

In a letter dated March 14, 2016, Melton wrote to Defendant Carter, a Health Services Administrator, to request that he no longer receive Neurontin because one of its uses is for treatment of epilepsy and because it had caused him addiction symptoms. Melton also complained that he had not received a referral to a podiatrist and demanded to be allowed to order his own medical shoes as part of the treatment of his foot condition.

On March 15, 2016, Melton was examined during a chronic-care visit by Dr. Tefferra, who referred Melton to a podiatrist for evaluation. On March 16, 2016, Melton had another chronic-care visit during which he reported negative side effects from the Neurontin, prompting its replacement in his medical regimen by Elavil. On April 10, 2016, Melton was informed that a prior x-ray of his left ankle confirmed that he has a degenerative joint disease. Melton raised no concerns about his foot pain.

In a letter dated May 24, 2016, Melton complained to Dr. Temesgen about his plantar fasciitis treatment, noting that the only treatment he had received consisted of receiving insoles, which had not worked, and Neurontin, which gave him negative side effects. He emphasized that he had regular pain in the ball of his foot that radiated to his toes, leaving him feeling as if he were walking on marbles and his toes were frostbitten. Although he acknowledged Dr. Barnes had informed him that the only treatment for chronic plantar fasciitis was pain management, Melton stated that he had done research on his symptoms and believed that his condition was not plantar fasciitis but metatarsalgia. Based on the alleged misdiagnosis, he asked to be referred to a podiatrist.

On May 30, 2016, Melton received comfort insoles. On June 24, 2016, during a continuing-care visit with Dr. Onabajo, Melton reported worsening pain in the soles of both feet, numbness, and difficulty walking. Dr. Onabajo, too, ordered a referral to a podiatrist for evaluation for possible Morton's Neuroma.

On August 2, 2016, Melton was taken outside JCI to visit a podiatrist, who examined Melton and diagnosed him with hallux limitus, mononeuritis of the limb, edema, and tinea pedis. The podiatrist recommended that Melton's feet be monitored daily, that he avoid walking in bare feet, that he elevate his legs, that he see a neurologist, that he be provided specialized orthotic shoe inserts, and that he be given a special foot cream. The podiatrist also recommended x-rays. In response to these recommendations, Melton was referred to a neurologist, the suggested x-rays were ordered, he was provided with the suggested foot cream, and a follow-up visit with the podiatrist was requested in order provide the orthotic inserts to Melton. On September 23, 2016, the podiatrist fitted Melton for orthotics. The podiatrist recommended that Melton receive extra-depth shoes to accommodate the inserts. The shoes appear to have been ordered.

## DISCUSSION

On July 14, 2016, Melton filed suit in this Court under 42 U.S.C. § 1983 asserting that the treatment Defendants have provided for his foot pain has been so inadequate that it amounts to deliberate indifference to a serious medical condition, in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. Melton seeks injunctive and monetary relief. In their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, the Medical Defendants assert that Melton's claim should be dismissed or summary judgment entered in their favor because Melton has failed to state and establish a viable Eighth Amendment deliberate indifference claim.

I.  **Legal Standard**

In order to consider the exhibits submitted by the Medical Defendants in support of their Motion, the Court must construe the Motion as one seeking summary judgment. Fed. R. Civ. P. 12(d). Ordinarily, summary judgment would be inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012). In his Opposition to Defendants' Motion, however, Melton does not object to consideration of Defendants' Motion as a motion for summary judgment and, in fact, submits exhibits of his own to supplement what he asserts are omissions in the medical records provided by Defendants. Under these circumstances, it is appropriate to consider Defendants' Motion as a motion for summary judgment. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## II. Wexford

Section 1983 allows individuals to sue in federal court any person who violates their federally protected rights while acting under color of law. 42 U.S.C. § 1983 (2012). The United States Supreme Court, in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), concluded that local government entities are considered "persons" for the purposes of § 1983, but they cannot be held liable solely because they employ an individual who committed an unlawful act. *Id.* at 690–91. Rather, local governments can be sued only if the constitutional violation alleged results from a custom or policy of the local government. *Id.* This standard also applies to private companies that employ individuals acting under color of state law, such as special police officers or prison medical personnel, who allegedly commit unlawful acts. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (citations omitted). Thus, a company such as Wexford is liable under § 1983 "*only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.*

Here, the evidence establishes that Melton received regular care for his foot condition, in the form of pain medication and insoles, and that in response to his continued complaints, he was referred for diagnostic testing and eventually to a specialist. Although Melton may take issue with whether that treatment was adequate to address his condition, the fact that he was regularly provided treatment renders his claim against Wexford fatally flawed. That regular course of treatment leaves Melton unable to establish that Wexford had an official policy or custom of not providing care. Nor is there any evidence that Wexford had an official policy or custom of refusing to treat inmates for foot conditions or to refer them to specialists for such conditions. Melton's claims against Wexford must therefore be dismissed.

## III. Individual Defendants

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *see also Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component—that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety—and a subjective component—that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1978) (holding that an official must have "knowledge" of a risk of harm, which must be an "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."

9

*Jackson*, 775 F.3d at 178; *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir. 1977).

Defendants do not dispute that Melton has a serious medical condition, specifically his chronic foot pain, which requires treatment. They deny, however, that they failed to treat it adequately and thereby acted with "deliberate indifference" to a serious medical need. *See Estelle*, 429 U.S. at 104. A review of the medical records reveals that, by his own estimation, Melton began having foot pain symptoms at JCI in March 2015, that he first went to the prison medical services about his condition in April 2015, and that from April 2015 to September 2016, he was regularly examined by medical staff, who provided him with foot insoles, a foot exercise regimen, and pain medication. However, Melton found these treatments insufficient to resolve his condition. When Melton suggested additional steps to take, medical staff did not agree. Melton's requests for an MRI, for special orthopedic shoes, and for a podiatry consultation were initially rejected. Melton first requested a podiatry consultation in August 2015 and consistently repeated the request without success until March 2016, when he was finally referred to a podiatrist. Notably, he was not actually transported offsite to see a podiatrist until August 2016, after he had filed this lawsuit. Similarly, Melton first asked for special shoes in February 2016,

and even offered to pay for them, but he did not receive those shoes until after he visited the podiatrist, who recommended special inserts and shoes. Although his foot was examined through the use of a bone scan, he never received an MRI.

The Wexford medical staff's decisions, and the lack of progress in resolving Melton's foot pain, may have stemmed from its diagnosis of his condition as plantar fasciitis, for which there are limited treatment options. When he finally saw the podiatrist in August 2016, however, the specialist diagnosed Melton as having different conditions, including mononeuritis, a form of nerve damage. After this diagnosis, he received specialized orthotic inserts and shoes, a medical foot cream, and a consultation with a neurologist.

Given that Melton's initial treatment was unsuccessful, that it took 11 months before Wexford medical staff referred Melton to a specialist, and that it took another five months and the filing of a lawsuit before Melton was actually able to see that specialist, Melton may have a legitimate basis to be frustrated with the quality of medical care he received. Nevertheless, where the medical records reflect frequent examinations by medical personnel, and Defendants readily provided medication, insoles, and therapeutic exercises intended to treat Melton's pain, there is no evidence that Defendants acted with deliberate indifference to Melton's medical needs. The fact that his condition may have been misdiagnosed does not establish deliberate indifference. *See Jackson*, 775 F.3d at 178; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "negligence or malpractice in the provision of medical services" does not constitute an Eighth Amendment violation). Nor does the fact that Defendants did not follow Melton's requests for certain referrals or types of treatment, because "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim" absent exceptional circumstances. *Wright*, 766 F.2d at 849. Where Melton has not identified any

exceptional circumstances that would support an inference of deliberate indifference, Defendants' Motion will be granted.

## IV. Defendant "Mr. Ombudsman"

Finally, the Court notes that Melton has sued, but has not yet served, a defendant identified only as "Mr. Ombudsman," which the Court assumes is an individual serving as an ombudsman at JCI. Because Melton is a prisoner, the Court must dismiss any part of the Complaint that, as relevant here, fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1) (2012).

Non-medical prison personnel can violate the Eighth Amendment if they intentionally delay an inmate's access to available treatment for a serious condition. *Estelle*, 429 U.S. at 104-05 (1976); *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995). Here, Melton makes no allegation, and there is no evidence to suggest, that the JCI Ombudsman intentionally delayed his treatment, only that Melton at some point contacted the Ombudsman to lodge complaints about his past treatment by the prison medical staff. However, prison non-medical staff are "entitled to rely" on the competence and expertise of prison health care providers. *See Miltier*, 896 F.2d at 854-55 ("No record evidence suggests why the wardens should not have been entitled to rely on their health care provider's expertise."); *Paige v. Kupec*, No. AW-02-3430, 2003 WL 23274357 at *2 (D. Md. Mar. 31, 2003) (stating that prison non-medical staff are "permitted to rely on the professional judgment of health care providers employed to care for inmates"), *aff'd* 70 F. App'x 147 (4th Cir. 2003) (per curiam). The JCI Ombudsman therefore cannot be held liable on an Eighth Amendment claim for failing to question the determination of the prison medical staff. Melton's claims against "Mr. Ombudsman" will be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is GRANTED. Melton's claims against Defendant Mr. Ombudsman are DISMISSED. A separate Order shall issue.

Date: September 27, 2017

THEODORE D. CHUANG
United States District Judge